NOTICE

Decision filed 06/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240147-U

NO. 5-24-0147

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 18-CF-28 |
| | ) | |
| TYLAR LEWIS, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Presiding Justice Cates and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for predatory criminal sexual assault and aggravated battery of a child are affirmed where even if the defendant's trial counsel was deficient, the defendant did not establish prejudice.

¶ 2    Following a jury trial in the circuit court of Saline County, the defendant, Tylar Lewis, was convicted of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and two counts of aggravated battery of a child (*id.* § 12-3.05 (b)(1)). Thereafter, the trial court merged the two aggravated battery convictions and sentenced the defendant to 40 years in prison for the predatory criminal sexual assault conviction and 20 years in prison for the aggravated battery conviction, to be served consecutively. On appeal, the defendant contends that his trial counsel was ineffective for (1) presenting to the jury, as impeachment evidence, police

1

interview videos of two of the State's witnesses and (2) agreeing to a submitted jury instruction with a typographical error. For the reasons that follow, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4       On January 17, 2018, the State, by information, charged the defendant with one count of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)) in that between January 10, 2018, and January 12, 2018, the defendant committed an act of sexual penetration against Tesla G., who was eight months old at the time. The State also charged the defendant with two counts of aggravated battery of a child (*id.* § 12-3.05 (b)(1)) based on allegations that, between the above dates, the defendant knowingly caused great bodily harm and permanent disfigurement to Tesla.

¶ 5       The jury trial commenced on August 7, 2023, at which the following testimony was presented. Chelsey H., Tesla's mother, testified that she started dating the defendant in October 2017 and they lived together. The defendant was not Tesla's father. At the time, it was believed that Brandon G., Chelsey's ex-boyfriend, was Tesla's father. Chelsey testified that on the evening of January 10, 2018, she was home alone with Tesla and put Tesla to bed around 9 p.m. or 10 p.m. She did not observe any injuries on Tesla that night. Before the defendant returned home, Devin Durham, Chelsey's friend, came to the house to hang out, and he gave her two benzodiazepines, which she immediately took. She estimated that Durham was there for 30 minutes, and he was never alone with Tesla. She explained that Durham was frequently at her house because she considered him family. Chelsey stayed awake until the defendant returned home around 2 a.m. or 3 a.m. after being gone for about 12 hours. Chelsey asked the defendant where he had been, and when the defendant refused to speak, she told him that she thought it would be best if he arranged to have someone pick him up the next day. Chelsey and the defendant then both fell asleep in the living room while Tesla was upstairs.

2

¶ 6    Around 7 a.m. on January 11, Chelsey woke up to a knock on the door from Durham. At the time, she was sleeping in the living room. Durham wanted to use her cell phone to call his girlfriend, so Chelsey let him come inside. The defendant and Tesla were upstairs in the bedroom at the time. After Durham left, the defendant brought Tesla downstairs wearing different clothes than what she had worn to bed. The defendant handed Tesla to Chelsey. Chelsey noted that Tesla was not crying at the time, but when Chelsey tried to give her a bottle, "something was terribly off" with Tesla's mouth. Chelsey explained that Tesla's mouth and gums "looked bloody a little bit." Chelsey then took Tesla upstairs to the bedroom, so that she could assess the situation. She did not say anything to the defendant at that time.

¶ 7    When Chelsey removed Tesla's clothing, Chelsey observed bite marks on Tesla's leg and arm as well as cigarette burns on her arm. Chelsey then removed Tesla's diaper and noticed that Tesla's diaper had recently been changed and that there was blood in the diaper. She observed that Tesla's vagina was "gaping open" and bleeding, so she believed that there had been penetration. Chelsey then looked around the room for the clothing that Tesla had worn to bed, and she found the outfit, a "blood filled diaper," and several bloody wipes in the trash can. Chelsey collected the items from the trash can, put them in individual plastic bags, and then put them together in a duffle bag. Chelsey noted that although Tesla had to be in pain, Tesla was not crying. Chelsey gave Tesla some Tylenol and called Whitney Scott, her friend, because she did not know what to do next. Chelsey explained that she needed Whitney's opinion because she did not believe that the defendant had injured Tesla. After calling Whitney, Chelsey went downstairs and asked the defendant who had been in the house. The defendant did not respond, so she went back upstairs to Tesla. Chelsey began packing bags for herself and Tesla while she waited for Whitney.

¶ 8    Whitney arrived approximately one or two hours later, and they started loading Whitney's vehicle with all of the bags, but they mistakenly left the duffle bag with the bloody items in the upstairs hallway. Whitney then took Chelsey and Tesla to Whitney's house. When they arrived at Whitney's house, Whitney suggested that they call Brandon. After calling Brandon, Chelsey realized that she had left the duffle bag at her house, so they returned to her house to retrieve it. However, the duffle bag was no longer at the house. Chelsey then woke the defendant, who was sleeping on the couch, and asked him about the duffle bag, but he did not respond. Shortly thereafter, the defendant's grandmother arrived to pick up the defendant. However, the defendant refused to leave with his grandmother because he could not find his phone. Also, at some point, Mark Hall, Whitney's cousin, arrived at the house. After the defendant's grandmother left, Chelsey, Whitney, Hall, Tesla, and the defendant left for Whitney's house. When they arrived at Whitney's house, Chelsey and Whitney took Tesla upstairs to wait for Brandon while the defendant and Hall remained in the living room. Chelsey testified that the defendant was never restrained, she never threatened him or his family, and she never observed anyone else threaten him or his family.

¶ 9    Brandon was "pretty upset" when he arrived at the house. Chelsey went into the living room and observed Brandon, Hall, and Durham asking the defendant what had happened to Tesla. Brandon became "heated" and hit the defendant. At that point, Chelsey left the living room and returned to the bedroom. From the bedroom, Chelsey heard Durham telling the defendant to stand up because Durham wanted to hit the defendant. Thereafter, Hall sat down with the defendant to get an explanation as to why the defendant would hurt Tesla. After talking with the defendant, Brandon and Hall left to take Tesla to the hospital while Durham remained in the living room with

the defendant. Shortly after, both Durham and the defendant left. Chelsey denied slapping the defendant or giving him any medication.

¶ 10 At around 3 a.m. the following morning, Chelsey contacted the Harrisburg Police Department and subsequently had an interview with Sergeant Curt Hustedde, a sergeant at the Harrisburg Police Department. At the time of the incident, she had an open case with the Illinois Department of Children and Family Services (DCFS) because she had marijuana and benzodiazepines in her system when Tesla was born. She also had a pending charge for endangering the life or health of a child. However, she did not strike, bite, burn, or cause bruises to Tesla, nor did she observe anyone injuring Tesla. Chelsey acknowledged that she made a bad judgment call when she did not immediately call 9-1-1 after discovering Tesla's injuries, but she explained that she was panicking.

¶ 11 On cross-examination, Chelsey acknowledged that while the defendant was living with her, she did not have any concerns about him being unsupervised around Tesla. She denied telling Whitney that Durham was at the house when she had fallen asleep. She admitted telling Whitney that Durham had returned to her house between 6 a.m. and 7 a.m., but he did not stay. She did not recall telling the defense investigator that she was awake until 5 a.m. talking with the defendant and that she had fallen asleep at 7 a.m. Instead, she explained that 7 a.m. was when Durham woke her up when he knocked on her door. She denied telling Whitney or the investigator that she would not let Durham inside the house. She did not recall mentioning Durham's name when she talked to Sergeant Hustedde during her two interviews, but she acknowledged that she never told Sergeant Hustedde that Durham brought her benzodiazepines. She explained that Durham was not her priority. She acknowledged that she never heard Tesla crying when the defendant was upstairs alone with Tesla. When she called Whitney, she explained that there was an emergency and that

5

something had happened to Tesla, but she did not go into detail or mention anything about bite marks. She did not remember whether she told Sergeant Hustedde that the defendant's grandmother had come to her house on the date in question, explaining that she did not remember because the incident was more than five years ago.

¶ 12    Chelsey acknowledged that she was concerned she would lose custody of Tesla once DCFS found out about Tesla's injuries, and she did not call 9-1-1 because she could not explain what had happened to Tesla while she was asleep and high on benzodiazepines. However, she never believed that Durham caused Tesla's injuries. She contacted Brandon because she wanted his support. Chelsey admitted that when the defendant brought Tesla downstairs with him, he had her cradled against him, and the blood on his T-shirt that was later collected as evidence could have been from Tesla lying on his shoulder. While she was upstairs in her house with Tesla, the defendant remained downstairs and acted like nothing had happened, which she thought was strange. Since the defendant remained in the house, she thought that someone else had been inside the house and had injured Tesla.

¶ 13    Chelsey did not confront the defendant about Tesla's injuries until Whitney arrived at the house. When Chelsey asked the defendant if he had bitten Tesla and why he had injured Tesla, the defendant did not respond. However, she acknowledged that she told Whitney and Sergeant Hustedde that the defendant denied the accusations after being confronted. She thought that Hall would be able to help her get answers from the defendant, but she noted that they were not trying to intimidate the defendant. By the time that the defendant was taken to Whitney's house, Chelsey had spoken with Whitney, Hall, and Durham about her suspicion that the defendant had caused Tesla's injuries, and they were all upset and angry. Once Brandon saw the injuries on Tesla, he also became angry at the defendant. While inside Whitney's house, the defendant was sitting in a

6

chair in the corner that was far from the door. Chelsey acknowledged telling Sergeant Hustedde that there was a lot of "freaking out and yelling" at the defendant and that the defendant was lucky to be alive. She also acknowledged that someone told the defendant that they would be easier on him if he told the truth. The defendant denied abusing Tesla to her.

¶ 14    Chelsey explained that she was called into the living room while the defendant was being questioned, and she saw Brandon and Durham each punch the defendant one time, but she left the room after Durham hit him. She explained that Brandon and Durham became enraged after hearing the defendant's answers to their questions. She did not believe that the defendant had lost consciousness. She told Sergeant Hustedde that the defendant had been beaten up and that he was injured, but she did not remember whether the defendant had complained about his head hurting or giving him Midol. She did not see the defendant physically abuse Tesla.

¶ 15    Whitney Scott testified that she had known the defendant for almost her entire life, but she did not hang around him. She noted that Chelsey had been one of her best friends since they were two years old. Whitney acknowledged that she had a 2022 felony conviction for possession of methamphetamine, she was a recovering drug addict, and she was currently on first offender probation from the 2022 conviction. Whitney was at Chelsey's residence on the afternoon of January 10[1] for approximately one hour. While there, Whitney held Tesla, and although Tesla was cranky, she did not exhibit any signs of injury. However, Whitney noted that Tesla was fully clothed at that time. Whitney also saw Tesla about one week prior to the incident, and she did not observe any injuries to Tesla.

---

[1]Although Whitney testified that she was at Chelsey's house on January 10, based on the timeline established by Whitney's recorded statement, it was likely she meant one or two days before.

¶ 16    Whitney further testified that on the morning of January 11, she was driving to Louisville, Kentucky when Chelsey contacted her and told her that it looked like Tesla had been punched. When Whitney returned from Louisville, Chelsey again called her about Tesla's condition, and Chelsey was "really frantic and made it sound really extreme." At around 4:30 p.m., Whitney arrived at Chelsey's house, and the defendant let her inside. The defendant told her that Chelsey was upstairs with Tesla, and he followed her upstairs. Whitney observed that Tesla had bruises and bite marks all over her body and a thumb print around her neck. Whitney and Chelsey decided to take Tesla to Whitney's house to determine what to do. Whitney called Hall and asked him to contact Brandon because Chelsey was scared to take Tesla to the hospital.

¶ 17    Whitney left Chelsey and Tesla at her house and left again to pick up Hall. Whitney and Hall then went to Chelsey's house to see if the defendant was still there. Whitney noted that the front door was open, and the defendant was sitting in a chair near the door. The defendant could not find his cell phone and wanted to talk to Chelsey, so he rode with Whitney and Hall back to Whitney's house. During the drive, neither Whitney nor Hall questioned the defendant about what had happened to Tesla. When they arrived at Whitney's house, Whitney went to her bedroom because Chelsey was there with Tesla. Brandon subsequently arrived, and he went into the bedroom to see Tesla. After seeing Tesla, Brandon went to the living room and talked to the defendant with Hall. Whitney could not hear the conversation because the bedroom door was closed, and she was not paying attention to what was happening in the living room. At some point, Durham, who was Whitney's step-nephew, arrived at the house. While at Whitney's house, the defendant was sitting in a chair in the living room, and he was not bound in any way. Whitney never observed anyone with a weapon or heard anyone threaten the defendant.

¶ 18    Whitney indicated that Brandon decided to take Tesla to the hospital, so Chelsey helped him put Tesla and Tesla's belongings in the vehicle. While Whitney was alone in her bedroom, the defendant calmly admitted to biting and shaking Tesla but denied doing "anything sexually to [Tesla]." Whitney did not respond to the defendant's admissions because she was in shock. The defendant then left the bedroom, and Whitney left the house with Chelsey. Brandon and Hall had already left with Tesla. When Whitney and Chelsey returned, the defendant and Durham were still there. At that point, Whitney told the defendant to leave the house, he asked her for a ride, and she turned him down. He then left. Whitney denied injuring Tesla.

¶ 19    On cross-examination, Whitney acknowledged that in early January 2018 she had seen Chelsey using Klonopin and methamphetamine. She did not remember speaking with an investigator on June 4, 2018, about Chelsey and Tesla. When asked whether the defendant appeared nervous on January 11, she noted that the defendant always looked nervous. Although she noted that Tesla needed to be taken to the hospital, she did not call 9-1-1. Instead, she called Brandon because, at the time, he was believed to be Tesla's father, and he could take Tesla to the hospital. While at Chelsey's house, Chelsey never told Whitney that the defendant had injured Tesla, and Whitney did not ask the defendant whether he had caused Tesla's injuries or who had caused the injuries. The defendant wanted to go with Whitney and Chelsey when they first went to Whitney's house, but Whitney told him no. When Whitney returned to Chelsey's house with Hall that evening, Durham was at the library parking lot with a group of boys. Durham periodically came to her house when he was fighting with his girlfriend. Whitney admitted that Durham did drugs.

¶ 20    Whitney acknowledged that she drove the defendant to her house, so he did not have a vehicle there. He also did not have a phone. She acknowledged that Brandon was mad about what

9

had happened to Tesla. Durham did not know anything about Tesla being injured until he came to her house that evening. When Durham saw Tesla's injuries, he became upset and started crying. Whitney admitted that during her March 6, 2018, police interview, she said that she wanted to kill the defendant, and that after he admitted to biting and shaking Tesla, she told him that he could either turn himself in or kill himself. She also acknowledged telling Sergeant Hustedde that the defendant was lucky to have walked out of her house that night. She did not see anyone threaten the defendant or his family, and she did not observe Durham punch or Chelsey slap the defendant. She noted that the defendant did not look scared or frightened, and when he left that evening, she did not see any wounds on his face.

¶ 21    Whitney testified that Chelsey said that Durham was at Chelsey's house on the night of January 10. Chelsey also said that Durham knocked on her door on January 11, but she did not answer the door. Chelsey claimed that the defendant was the only other person inside the home when Tesla was injured. Whitney acknowledged that the defendant did not admit to burning or sexually assaulting Tesla.

¶ 22    Curt Hustedde, a sergeant at the Harrisburg Police Department, testified that he was dispatched to the Harrisburg Medical Center on January 11 to assist with the investigation. While there, he observed that Tesla appeared to have human bite marks on her arm, buttocks, neck, and inner thigh. He estimated that the bite mark on Tesla's inner thigh was about 1/2 inch or 1 inch from her vagina. Tesla also had "[r]eally bad bruising" on her face.

¶ 23    Based on information that he learned from Chelsey, Sergeant Hustedde went to the Harrisburg Public Library on January 12 to recover potential evidence in the dumpster located on the library's parking lot. The defendant and Chelsey lived approximately 50 to 100 feet from that library. Inside the dumpster, Sergeant Hustedde discovered a plastic bag containing a bed sheet,

10

two diapers, and baby wipes, all of which had blood-like substances on them. He noted that the diapers were soaked with the blood-like substance. Sergeant Hustedde also recovered a pair of leopard print children's pants with apparent blood stains. Chelsey also gave Sergeant Hustedde items from her residence that she believed was pertinent to the case. Specifically, Chelsey turned over a pillow and the defendant's striped T-shirt, both of which had blood-like substances on them. The apparent blood stain on the T-shirt was on the shoulder area.

¶ 24    Sergeant Hustedde testified that on January 12, the defendant, who was 19 years old at the time, voluntarily came to the police department for an interview. Even though the interview was voluntary and noncustodial, Sergeant Hustedde read the defendant his *Miranda* rights.[2] The interview was played for the jury. During the interview, Sergeant Hustedde told the defendant that the defendant was not under arrest and verified the defendant's age. The defendant stated that, on the morning of January 10, he was alone upstairs with Tesla while Chelsey was downstairs. Tesla started puking blood, so he brought her downstairs to Chelsey. He was only alone with Tesla for about 15 seconds. He did not know why Tesla was puking blood but speculated that she had fallen and had hit her head. When he brought Tesla downstairs, Durham was there with Chelsey.

¶ 25    The defendant stated that the following afternoon, Whitney Scott and Mark Hall took him to Whitney's house in Pankeyville. Whitney was Chelsey's friend, and Hall was Whitney's cousin. At the house, Hall and Durham accused the defendant of molesting and beating Tesla and then "started beating the s*** out" of him. The defendant showed Sergeant Hustedde a mark on his forehead that he said was caused by the beating. The defendant acknowledged that he had admitted to biting Tesla at the time, but he explained that he only made the admission because he was

---

[2]See *Miranda v. Arizona*, 384 U.S. 436 (1966).

terrified. He explained that they were beating him, Hall had threatened to kill him and his family, and Durham had recently been released from prison.

¶ 26    During the police interview, the defendant initially denied causing Tesla's injuries. He had never seen Chelsey abuse Tesla, but he noted that Chelsey sometimes fell asleep holding Tesla while she had a lit cigarette in her hand. He saw bite marks on Tesla, but he denied biting her and did not know what caused the marks. While at Whitney's house, "they" told him that his DNA was found on Tesla from him sexually assaulting her, but he was confused as to how the results were obtained so quickly. He suggested that Tesla's vaginal injuries and/or bleeding were the result of Tesla being constipated. Sergeant Hustedde explained that he had recovered a plastic bag from the library's dumpster and asked the defendant to guess what was in the bag. The defendant stated, correctly, that the bag contained a bed sheet and two diapers, one of which was saturated with blood. He insisted that he knew the bag's contents because Chelsey showed it to him.

¶ 27    Also, during the interview, Sergeant Hustedde suggested that the defendant got frustrated with Tesla and bit her. The defendant then admitted that he had gotten frustrated and had bitten Tesla when he was alone upstairs with her, but he denied beating her. For the rest of the interview, he continued denying causing the other injuries, including the sexual assault. The defendant agreed to give a bite mark sample for comparison. Sergeant Hustedde also took buccal swabs from the defendant. When doing the swabs, the defendant indicated that his jaw was sore from being punched.

¶ 28    After the video was played, Sergeant Hustedde testified that the defendant was immediately taken into custody. Sergeant Hustedde noted that during the interview, the defendant made six admissions to biting Tesla. At the time of the interview, the defendant had an injury on his left temple that was approximately the size of a dime or penny, but it was not bleeding. Sergeant

12

Hustedde observed that the defendant walked normally, never said that he had a headache, and never indicated that he was in pain or needed medicine. Sergeant Hustedde also noted that the defendant did not exhibit any signs of having a head injury or of being in shock. The defendant knew the date and corrected Sergeant Hustedde's spelling of Durham's name. The defendant answered all of Sergeant Hustedde's questions and did not appear to be under duress. Sergeant Hustedde never threatened the defendant or made any promises to him.

¶ 29 On cross-examination, Sergeant Hustedde acknowledged that, during the defendant's interview, the defendant also denied biting Tesla. Sergeant Hustedde admitted that no one witnessed the defendant biting, bruising, or sexually assaulting Tesla. During the investigation, Sergeant Hustedde spoke with Hall, and Hall never told Sergeant Hustedde that the defendant had been beaten. Sergeant Hustedde explained that Chelsey had reported that the defendant had thrown the various items into the dumpster. Chelsey had also indicated that the defendant had admitted to her that he had bitten and raped Tesla. Sergeant Hustedde was not aware that Chelsey was under investigation by DCFS at this time. Sergeant Hustedde acknowledged that during the defendant's interview, the defendant complained about his jaw hurting.

¶ 30 Sergeant Hustedde acknowledged that before interviewing the defendant, Sergeant Hustedde had received reports from Hall and Chelsey that the defendant had admitted to biting Tesla. Thus, Sergeant Hustedde suspected that the defendant was involved in the incident. Sergeant Hustedde noted that his objective in the case was not to investigate the defendant's allegations that the defendant had been beaten and threatened after Tesla's injuries were discovered. However, Sergeant Hustedde noted that the defendant's admissions to him made the defendant's admissions to the others more credible.

¶ 31 Sergeant Hustedde acknowledged that although Durham was present at Chelsey's house on the morning in question, Sergeant Hustedde never interviewed him. However, Sergeant Hustedde explained that the defendant's account excluded Durham as a suspect. Sergeant Hustedde also acknowledged that during the defendant's interview, he did not correct the defendant's understanding that the officers already had the defendant's DNA.

¶ 32 On redirect examination, Sergeant Hustedde indicated that the police had investigated Durham's involvement in the incident, as DNA samples were taken from Durham for DNA comparison. According to the defendant's version of events, he was upstairs alone with Tesla while Chelsey was downstairs, and Durham did not arrive at the house until after the trauma occurred. Also, Sergeant Hustedde indicated that the defendant was the primary suspect in the case because the defendant had made six admissions to biting Tesla. Sergeant Hustedde reviewed the video surveillance footage from the library, but the quality of the video was too low to see who threw the evidence into the dumpster.

¶ 33 Brandon G. testified that he had two children with Chelsey and that, for five months, he had lived with her in the house near the library. Although it was ultimately determined that he was not Tesla's father, Tesla had his last name, and he helped raise her for the five months that they lived together. Brandon moved out of the residence in December 2017 and the defendant moved in around that time. At around 5 a.m. or 6 a.m. on January 11, Brandon received a Facebook message from his cousin Hall asking him to go to Whitney's residence because something had happened with the defendant and Tesla. Brandon arrived at Whitney's residence around 7:30 a.m. or 8 a.m. When he arrived, he noticed that the defendant and Hall were sitting in the living room. Hall directed Brandon to check on Tesla, who was in the bedroom. Brandon noted that Tesla was only wearing a diaper and that she had bruises on her arm, a bite mark on her inner left thigh, and

14

burn marks that appeared to be cigarette burns on her buttocks. Whitney and Chelsey were also in the bedroom with Tesla. Brandon admitted that seeing Tesla's injuries made him a little upset.

¶ 34     Brandon spoke with Chelsey and Whitney and then returned to the living room to talk with the defendant. During their conversation, the defendant admitted that he bit Tesla in the leg because he could not get her to stop crying. Hall was present when the defendant made that admission. The defendant never admitted to causing Tesla's other injuries.

¶ 35     After the defendant admitted to biting Tesla, Brandon told the defendant to stand up and put his hands up. The defendant did as told, and Brandon then punched the defendant once in the forehead, the defendant bounced against the wall, and Brandon punched the defendant in the forehead a second time. Brandon then returned to the bedroom to persuade Chelsey and Whitney to let him take Tesla to the hospital. From the bedroom, Brandon heard a thump, and when he returned to the living room, he observed the defendant lying on the ground. Hall and Durham were in the living room at that time, and Durham said that he had hit the defendant twice. Brandon did not know Durham, but Durham was Whitney's cousin.

¶ 36     Brandon and Chelsey then went to Chelsey's residence to get Tesla's clothes. At Chelsey's house, Brandon observed a bloody T-shirt in the upstairs bedroom where Chelsey and the defendant would have slept. He noted that Tesla slept in that same room. After collecting Tesla's clothes and toys, they returned to Whitney's house to pick up Tesla. The defendant was sitting in a chair at Whitney's house when they returned. Chelsey then smacked the defendant but also gave him a Midol because he complained that his head hurt. Brandon and Hall then took Tesla to Brandon's mother's house. Brandon was afraid to take Tesla to the hospital because he did not want to go to jail for beating up the defendant, so his mother and stepfather took Tesla. Brandon's children were also at his mother's house, and he stayed there with them.

15

¶ 37    Brandon had held Tesla a few days before the incident, and he did not observe any injuries on her. However, he noted that she was fully clothed at the time. Brandon denied injuring or sexually abusing Tesla. He acknowledged that, during his police interview, he did not tell the officers that he had punched the defendant. Brandon indicated that while the defendant was at Whitney's house, the defendant was not bound in any way, and neither Brandon nor Hall had a weapon.

¶ 38    On cross-examination, Brandon indicated that the defendant did not appear to be scared when Brandon confronted him about Tesla. Brandon acknowledged that the defendant had denied burning and sexually abusing Tesla. Brandon also acknowledged that he had punched the defendant with enough force that the defendant had bounced off the wall. Although Durham had told Brandon that Durham had hit the defendant twice and knocked the defendant out, Brandon never saw the defendant lose consciousness. Brandon also never heard anyone threaten the defendant or the defendant's family, and there was no yelling during the time that Brandon was at Whitney's house. Brandon indicated that Hall calmly talked with the defendant to get information about Tesla's injuries, but Brandon did not know what Durham was doing the entire time they were there.

¶ 39    Devin Durham testified that he was currently incarcerated for methamphetamine possession and burglary but had received no promises in exchange for his testimony. He also had previous convictions for theft. Durham indicated that he had known the defendant and Chelsey since he was a child. Prior to the incident, he considered the defendant a friend. Early in the morning on January 11, 2018,[3] Durham dropped off a bag of his clothing at Chelsey's house because he was arguing with his girlfriend. He left the bag on the driveway and did not go inside

---

[3]From the timeline established by the other witnesses, it appears that Durham meant January 10.

16

the house. The following morning, he returned to Chelsey's house, and the defendant was sitting outside. The defendant was the only person there. Durham noted that the defendant appeared "messed up off some kind of drugs" and was nodding in and out of consciousness. The defendant wanted to call Chelsey, and Durham would not let the defendant use his phone, so Durham carried the defendant to the nearby gas station. The defendant used the phone at the gas station and then they returned to the house. Upon returning, he noticed that Whitney, Hall, Chelsey, and Tesla were all in a vehicle in the library's parking lot. Chelsey showed Durham the bite and burn marks on Tesla and said that the defendant had caused the injuries. Durham then assisted the defendant into the vehicle, and the defendant and Durham rode to Whitney's house with the others. At some point, Brandon also arrived at Whitney's house.

¶ 40     Whitney, Chelsey, and Tesla were in the bedroom while Durham was in the living room with Brandon, Hall, and the defendant. Durham was told that the defendant had bitten, burnt, and raped Tesla. Durham then went to the bathroom to smoke methamphetamine. After leaving the bathroom, he went into the living room and asked the defendant whether the defendant "did it." The defendant responded that he had not. Durham then told the defendant to stand up, and when the defendant did, Durham hit the defendant two or three times in the mouth, causing the defendant to fall to the ground. Durham noted that when the defendant fell to the ground, the defendant did not hit his head on the ground. After punching the defendant, Durham again asked the defendant whether he had "done it," and the defendant responded that he had. Durham believed that the defendant was admitting to burning, biting, and raping Tesla. Durham then hit the defendant again and told him to leave the residence, which the defendant did. Durham noted that the defendant was able to support himself, he was not stumbling, and he was walking normally. Durham had never been alone with Tesla, and he denied burning, biting, and sexually assaulting her. Although he had

17

only met Tesla two times, he punched the defendant for hurting her because he also had children and for the principle of the matter.

¶ 41    On cross-examination, Durham did not remember whether he had given Chelsey benzodiazepine, but he indicated that he did not supply her with any other drugs. When Chelsey told Durham that the defendant bit, burned, and sexually assaulted Tesla, the defendant was standing there. However, Durham did not recall the defendant's response to the accusations. Durham claimed that methamphetamine did not alter or impact his ability to perceive events. He did not threaten the defendant or the defendant's family. He also did not hear anyone threaten the defendant or the defendant's family or say that there was DNA evidence connecting the defendant to Tesla's rape. He noted that Brandon punched the defendant in the face after he had punched the defendant, but he did not remember how many times Brandon had punched the defendant. He acknowledged that the defendant initially denied injuring Tesla. He explained that he could not take Tesla to the hospital because he did not have a driver's license, but he had asked Chelsey and Whitney to take Tesla. However, Chelsey did not take Tesla because she had an open DCFS case and was afraid of getting into trouble. He acknowledged that while at Whitney's residence, there was yelling and screaming directed at the defendant. He did not see Chelsey strike the defendant. Durham talked with Sergeant Hustedde sometime after the incident occurred.

¶ 42    Denise Hays, the emergency room charge nurse at Harrisburg Medical Center, testified that she was the first person to examine Tesla. During the initial assessment, Tesla was very lethargic, which could have been attributed to mild dehydration. Hays also observed bruising in multiple stages of healing all over Tesla's body as well as bite marks and cigarette burns. Hayes observed that Tesla's frenulum was torn loose under her tongue, although Hays opined that the color of the surrounding tissue indicated that the injury was not new. Hays did not look for any injuries to

18

Tesla's vagina, explaining that examining a baby's vagina required specialized care. Tesla was ultimately transferred to St. Louis Children's Hospital.

¶ 43    Dr. Tara Copper, a pediatric emergency room physician at St. Louis Children's Hospital, testified that she examined Tesla on January 11, 2018, and found bruising on Tesla's face, neck, extremities, chest, and around Tesla's anus. Dr. Copper noted that four of the bruises appeared to be human bite marks, which indicated inflicted trauma. Dr. Copper also observed a laceration on Tesla's frenulum, which connected the tongue to the base of the mouth; a laceration to Tesla's vagina; and some redness around Tesla's vagina. Dr. Copper indicated that the injuries on Tesla's frenulum and vagina suggested potential blunt force trauma. Dr. Copper also observed round burn marks on Tesla's left upper buttock and left foot, which could have been cigarette burns. Dr. Copper explained that Tesla's injuries were consistent with physical abuse and sexual assault. During Dr. Copper's testimony, photographs of Tesla's injuries were published to the jury. On cross-examination, Dr. Copper acknowledged that she was unable to determine whether Tesla's injuries occurred at the same time or over time, and she could not say when the burn injuries and bruises were inflicted. She also could not say what object caused the injury to the vagina. She doubted that a Q-tip caused the laceration but noted that it was possible depending on the amount of force used.

¶ 44    Lori VanHoy, a DCFS worker, testified that on January 11, she went to the Harrisburg Medical Center after receiving a hotline call about a child suffering physical abuse as well as potential sexual abuse. VanHoy observed that Tesla appeared to be in distress; Tesla had bruising all over her body, including on her face, chest, and buttocks; she had bite marks on her upper right arm, neck, and left inner thigh near the vaginal area; and she had circular burn marks on her left calf, left foot, and buttocks. VanHoy noted that the burn marks were consistent with cigarette

19

burns. VanHoy also observed that Tesla's frenulum had been torn and that Tesla's teeth were embedded in the gum. VanHoy took photographs of Tesla's various injuries, and those photographs were admitted into evidence. VanHoy indicated that based on the location of the bite marks, and the fact that Tesla only had four teeth, the bite marks were not self-inflicted. She also noted there was no indication that the burns were self-inflicted. VanHoy noted that the allegations that Tesla had been physically and sexually abused were corroborated by Tesla's condition.

¶ 45 On cross-examination, VanHoy noted that Tesla's burns were red and appeared recent, but VanHoy was unable to say when the burns actually occurred. VanHoy was present during Chelsey's March 6, 2018, police interview, and VanHoy never heard Durham's name mentioned.

¶ 46 Dr. David Wold, who was certified as an expert in dentistry and forensic odontology, testified that he reviewed 30 photographs of Tesla's bite marks to determine whether the marks were human bite marks. Based on a reasonable degree of medical certainty, he concluded that two of the marks were human adult bite marks, two were inconclusive, and two were not human bite marks. Dr. Wold noted that the human bite marks were located on Tesla's right shoulder/upper arm and left inner thigh near her genital area. He concluded that the similarity of the characteristics in the two bite marks suggested that the marks were made by the same person. He also concluded that the bruising around the marks suggested that they were made with "quite a bit of force" and that the force was enough to cut and/or damage the skin. He also noted that the bite mark on Tesla's inner left thigh would have been made by a person whose face was near her private parts.

¶ 47 Abigail Henn, a lieutenant in the Illinois State Police's (ISP) scene and evidence services, testified that on January 12, she collected potential evidence from Chelsey's residence. She also took numerous photographs of the residence, which were admitted into evidence. Inside the residence, Lieutenant Henn observed that there were cigarette butts on the living room floor and

the dining room table; a pile of clothes, trash, burnt cigarettes, and a plaid blanket with a blood-like stain on the main bedroom's floor; and a highchair, an open box of baby wipes, unused diapers, and an open box of Ziplock bags in the main bedroom. Lieutenant Henn treated the highchair with a blood enhancement chemical and received a positive reaction, so she collected swabs from the highchair.

¶ 48    Michael Brown, a former forensic scientist at the ISP's Metro East Forensic Science Laboratory, testified that he tested the evidence collected from the dumpster and from Chelsey for the presence of blood and/or semen. He stated that the stains on the plaid blanket and in the diapers were blood indicated. He also tested Tesla's vaginal swab and external genital swabs and noted that although there was no semen detected, there was blood indicated. On cross-examination, Brown explained that DNA testing was not completed on the bite marks because there likely would not be any residual biological evidence in those locations because Chelsey had wiped Tesla down with baby wipes.

¶ 49    Jay Winters, a forensic scientist at ISP's Metro East Forensic Science Laboratory, testified that he conducted DNA analysis in this case. Regarding the DNA sample of the stain on the plaid blanket, he concluded, within a reasonable degree of scientific certainty, that Tesla was the source of the profile. As for the DNA sample from the stain on the diapers, he also concluded that Tesla was the source of the profile. Regarding the swabs from the bite mark on Tesla's inner thigh, Winters identified a mixture of at least two individuals. The major contributor was a human female DNA profile with Tesla being included as a possible source, and the minor DNA profiles were inconclusive. Winters excluded Durham as the major contributor to this profile and as a possible source of the swabs taken from one of the diapers.

¶ 50    On cross-examination, Winters indicated that the defendant was also excluded as being the major contributor from the inner thigh bite mark swab. Winters agreed that innocent contact with a child could leave DNA traces and that wiping down a baby with baby wipes could remove DNA. He agreed that Durham's DNA samples were submitted for elimination purposes.

¶ 51    Eric Corey, who was an ISP forensic biologist and DNA analyst, testified that he performed a Y-STR DNA analysis on Tesla's oral swab from the sexual assault kit and the samples taken from the bite marks on Tesla's left forearm and left inner thigh. He explained that a Y-STR DNA analysis essentially ignored female DNA and only analyzed for the presence of male DNA types on the Y chromosome. Regarding the oral swab, Corey found that the defendant could not be excluded as a contributor and that it was approximately three times more likely that the defendant, or a male relative of his, was a contributor compared to a random male. Durham was excluded as a possible contributor on the swab. As for the forearm bite mark swab, Corey identified a mixture of at least four males with one major contributor and found that the defendant could not be excluded. However, Durham was excluded as a possible contributor to the major profile. Regarding the inner thigh bite mark swab, Corey identified a mixture of at least three males with one major contributor and found that the defendant could not be excluded as the contributor to the major profile. Durham was again excluded as a possible contributor to this major profile.

¶ 52    On cross-examination, Corey acknowledged that the bite marks were not tested for saliva and that he was not asked to test them for saliva. He acknowledged that testing the samples for saliva could have been "somewhat helpful" but noted that the saliva test was not perfect, not as sensitive as DNA analysis, and could consume the entire sample. Thus, he did not agree that saliva testing should have been conducted in this case.

22

¶ 53    Kathleen Houston, a certified pediatric sexual assault nurse examiner, testified that she performed the sexual assault examination on Tesla. Houston explained that a sexual assault examination was a head-to-toe physical exam to collect evidence of sexual assault. Houston observed four to five bite marks on Tesla's body, a large injury under her tongue, "many, many bruises" on her body, patterned injuries that looked like burn marks, and a laceration on the entrance of her vagina. Houston indicated that the injury to Tesla's vagina was consistent with blunt force trauma. Based on the examination, Houston concluded, within a reasonable degree of medical certainty, that Tesla was the victim of physical and sexual abuse. She also concluded that Tesla's injuries were not accidental or self-inflicted. On cross-examination, Houston noted that Tesla was "fussy" during the exam and that Tesla had no trouble crying. Houston also noted that she could not accurately date bruises and bite marks.

¶ 54    Dalton Conkle, who was currently incarcerated at Shawnee Correctional Center, testified that in April 2023 he was being held at the Saline County jail. At that time, Conkle shared a cell area with the defendant, and the defendant had discussed his case with Conkle. During their discussion, the defendant admitted that he had "bit the baby and burned it and that he used a Q-Tip in the vagina." The defendant blamed the incident on drugs. Conkle testified that although he was friendly with the defendant, his trial testimony was the result of prayer and his conscience and that he was not made any promises in exchange for his testimony.

¶ 55    Before the State rested its case, defense counsel brought an issue to the trial court's attention outside the jury's presence. Defense counsel noted that, during Sergeant Hustedde's cross-examination, counsel had attempted to provide the foundation for impeaching the testimony of Chelsey and Whitney by asking about the inconsistencies between their trial testimony and their accounts given to Sergeant Hustedde five years earlier. However, Sergeant Hustedde indicated that

23

he had not reviewed the taped interviews and did not have sufficient recollection of the interviews to answer questions in detail. Also, defense counsel noted that both Chelsey and Whitney, during their trial testimony, stated that they did not remember, or even denied, saying certain things during their interviews, even though the interviews showed them saying the things they were being questioned about. Consequently, defense counsel argued that he was unable to impeach their prior statements because the impeaching witness, Sergeant Hustedde, did not have a sufficient recollection of the interviews. Thus, defense counsel argued that the only way to sufficiently impeach Chelsey and Whitney was to play the actual interview videos for the jury, so the jury could see what was actually said.

¶ 56    The trial court then interjected, noting that it was "a little weird" that defense counsel was impeaching the witnesses through a third party and that counsel could have played the relevant portions of the videos during the witnesses' testimonies. Defense counsel replied that the videos were quite substantial. In addition, counsel explained that he specifically wanted to question Chelsey as to whether she ever mentioned Durham during her police interview, but if she responded that she did not remember, then the entire video needed to be played to establish that she never mentioned Durham's name. Defense counsel argued that if he was not permitted to play the videos for the jury, the defense would be substantially impaired, as they would not be permitted to inquire into the contrary statements that Chelsey and Whitney had made on significant issues. In response, the State expressed its concern with the videos' contents, noting that there were likely several things in the videos that normally would be inadmissible, including statements about other things that the defendant did that would be prejudicial. Defense counsel then indicated that the videos would be played "at our peril." He noted that, for instance, Whitney said "some horrible, unjustifiable things that [were] way out of bounds" but that he could not just play part of her video.

24

He noted that he would not selectively edit the videos and that the videos were necessary and essential to the impeachment of the witnesses.

¶ 57    The trial court then told defense counsel that it would be better to select and edit the various clips that would be used for impeachment. Defense counsel noted that the trial court's point was well taken and that he had attempted to edit the videos, but he lacked the technological ability to edit the videos or to prepare the transcripts with time stamps. The State then indicated that one of the statements made by either Chelsey or Whitney was that the defendant had tried to poison his brother with antifreeze. The State argued that those kinds of statements should not be brought out. The State noted that it was trying to protect the integrity of the trial and that defense counsel wanted to "throw caution to the wind" and allow the jury to hear everything in the videos. The State also noted that it had not tendered any of those exhibits as evidence in its case. Defense counsel again responded that he understood that playing the videos was at their own peril, but counsel still wanted to play the videos in their entirety.

¶ 58    The trial court then noted that if defense counsel showed video clips to complete the impeachment, the trial court would not permit the State to show the rest of the videos. However, defense counsel replied that if playing the videos was error, it was his error, and the defense could not then complain as to any prejudice that resulted from the derogatory or otherwise irrelevant assertions that were made. The trial court then asked defense counsel whether there was an alternative option and whether counsel could sufficiently complete his impeachment with transcripts. Counsel responded that preparing transcripts was challenging because of the "starting and the stopping in the right places and having that cross-reference to what they had said, that was just—it was too much." He also noted that the other issue, which specifically concerned Chelsey's

25

interview, was that Chelsey never mentioned Durham's name in her interview, but the entire video would need to be played to demonstrate that.

¶ 59    The trial court then stated that it would allow defense counsel to attempt to complete the impeachment by showing the videos with the caveat that if the videos showed prejudicial matters that were otherwise inadmissible, and counsel was not prepared to edit out those prejudicial matters, then counsel was showing them at his own peril. Defense counsel said that he understood and would communicate with his staff to see what could be done with the videos.

¶ 60    Thereafter, the jury was brought back into the courtroom, and the State rested its case. Defense counsel then presented testimony from Garry Lewis. Garry's daughter, Annette Lewis, was the defendant's aunt, but she had raised the defendant. Garry indicated that sometime in early January 2018 Garry went to Chelsey's house because the defendant was living there, and the defendant needed help finding his phone. Garry estimated that he arrived between 4:30 p.m. and 5:30 p.m., and he was there until 12:30 a.m. or 1 a.m. Tesla was not in the house at the time. When Garry left the residence, the defendant was falling asleep in the living room chair. Diana Lewis, Garry's wife, testified that she went to Chelsey's residence sometime in the second week of January 2018 after her husband asked her to check on the defendant because the defendant had lost his phone, and he did not have a vehicle. Diana indicated that she arrived at about 12:30 p.m., but the defendant was not there. Another male answered the door, and Chelsey would not let Diana inside. Diana left shortly after but returned at approximately 1:30 p.m. or 2 p.m., and no one answered the door then.

26

¶ 61    Annette testified that she received a phone call on the evening of January 10[4] from an unknown lady asking Annette to pick up the defendant from the Harrisburg Wal-Mart because he was injured. Annette then called her sister-in-law Toni and asked Toni to pick up the defendant and take him to the hospital where Toni worked, so that Annette could pick him up there. When Annette arrived at the hospital, the defendant was waiting for her in Toni's vehicle. Annette noted that he was crying, hysterical, and panicked. The defendant did not want to go into the hospital to be checked out and just wanted to go home. Annette noted that the defendant had a head injury, and it looked like something had been scraped on his face. The defendant told Annette that Brandon and Durham had beaten him and threatened to kill him and his family. Annette testified that she then took the defendant home and tried to calm him down, but he was worried that "[they were] going to come and get us." He complained of having a headache and nausea.

¶ 62    At some point, Annette received a phone call from a Shawneetown police officer and was told that the defendant needed to come to the Harrisburg police station to speak with Sergeant Hustedde. The person did not indicate why the defendant needed to be interviewed, but there was no indication that the defendant was under arrest. Annette then called her father, and they took the defendant to the police department. On cross-examination, Annette acknowledged that she did not know that the defendant was going to admit to biting a child during his police interview. She had never seen the defendant under the influence of drugs and thus would not know how he acted in that condition.

¶ 63    Erik Hall, the director of the forensic science program at St. Louis University, testified as a defense expert in the field of DNA. Hall indicated that he was asked to provide his opinions on

---

[4]Although Annette said January 10, it appears, based on the timelines of the other witnesses, that she meant January 11.

27

the DNA evidence in this case; and that he had reviewed the DNA analysis reports, the biological screening report, and the analysts' notes. Hall indicated that innocent contact with an infant, such as cleaning, changing, or putting the infant in a car seat, could be sufficient to leave DNA on the infant. Hall noted that a saliva test on the bite marks could have provided more information, as it would indicate whether there was potential saliva in those areas.

¶ 64    Kevin McClain, a licensed private investigator, testified as an expert in best practices for criminal investigations. McClain indicated that he was retained by the defense to assist in the investigation of this case. As part of his investigation, he interviewed Whitney on June 4, 2018. During the interview, Whitney indicated that she was at Chelsey's house around 4 p.m. or 5 p.m. the night before Tesla's injuries were discovered, and Durham was also there. Whitney further indicated that Durham was at Chelsey's house later that night when Chelsey fell asleep. Chelsey told Whitney that Chelsey had woken up when Durham came over around 7 a.m. and that this was around the same time that the defendant brought Tesla downstairs. When Whitney confronted the defendant about Tesla's injuries, he stated that he was downstairs in the recliner and blamed Durham. Whitney also indicated that Chelsey questioned whether Tesla's injuries were caused by Durham. Whitney stated that the defendant had eventually admitted to biting and hitting Tesla but had denied sexually assaulting Tesla. Whitney noted that nothing happened to the defendant while the defendant was at her house. She also noted that when the defendant left her house, he had "no marks" on him and that she did not know how he ended up with marks on him. McClain testified that he watched Whitney's police interview video and noted that there was a lot of conversation about Durham, but in her interview with McClain, she only indicated that Durham was at her house for five minutes.

28

¶ 65    McClain testified that on June 13, 2018, he also interviewed Chelsey. Chelsey indicated that on the morning of the incident, Durham knocked on her door at approximately 7 a.m., but she did not let him inside the residence. She never mentioned that she was given or had taken benzodiazepine. She claimed that Durham was not at Whitney's house the day of the incident. She also claimed that no one had beaten the defendant when he was at Whitney's house. She noted that the defendant was allowed to leave Whitney's house after a couple hours.

¶ 66    McClain testified that on July 1, 2018, he interviewed Durham. Durham initially denied being at Chelsey's house the morning of the incident but then later admitted being there between 7:30 a.m. and 8:30 a.m. Durham also initially denied being at Whitney's house but eventually admitted to being there for five minutes. He also said that he heard about Tesla's injuries two days after the incident. He never mentioned that Chelsey had shown him Tesla's injuries or that he had carried the defendant to a gas station on the day of the incident. McClain noted that Durham's statement was never taken by law enforcement, which McClain found significant, as it could have helped establish a timeline and identify who was around Tesla when she was injured.

¶ 67    On cross-examination, McClain acknowledged that if Tesla's mouth was covered, her yells or cries might have been lower. McClain also acknowledged that he watched the defendant's police interview video where the defendant made six admissions of biting Tesla and confirmed that he had 100% bitten Tesla. On redirect examination, McClain noted that the defendant was not asked follow up questions after his confession and thus his confession was not authenticated.

¶ 68    Dr. Timothy Morthland, an emergency room physician who treated Tesla at the Harrisburg hospital, testified that he observed various bruises and bite marks over Tesla's body. Based on his observations of Tesla's injuries, he believed that the age of the bruises and the various other injuries were "not of the same date" and that the abuse would have occurred over more than one

29

day, if not over a period of weeks. He also noted that Tesla's injury to the frenulum showed tissue regeneration, which emerged days, not hours, after a primary wound. Dr. Morthland testified that he had received training in the diagnosis and treatment of concussions and that a person suffering from a concussion could experience nausea and a headache. He also indicated that the symptoms could begin immediately and last for days, weeks, or years. He noted that a person who experienced a concussion might have poor perception, might be disoriented, might not be able to interpret reality correctly, and could not be relied upon to make sound decisions. On cross-examination, Dr. Morthland acknowledged that he had never examined the defendant or reviewed any medical reports regarding the defendant being examined for and/or diagnosed with a concussion. He also acknowledged that there was no definite time when a bruise would visually change and that bruises did not always appear red with purple and yellow in the earliest stage.

¶ 69    Sergeant Hustedde was then recalled as a witness. He testified that he did not recall ever interviewing Durham with respect to this case. He identified the video of the interview that he had conducted of Chelsey on January 12, 2018, the video of the interview that he had conducted of Whitney on January 18, 2018, and the video of the second interview that he had conducted of Chelsey on March 6, 2018. Those videos were then played for the jury. Defense counsel played Whitney's interview video starting at 15 minutes and 39 seconds and stopped the video early. Counsel stopped playing Chelsey's second interview video when 40 or 45 minutes were remaining. Sergeant Hustedde then testified that he did not recall Durham's name ever being mentioned during Chelsey's second interview. Also, he did not believe that Durham's name was mentioned in Chelsey's first interview.

¶ 70    The defense then rested its case. After the close of the evidence, the trial court conducted the jury instruction conference outside the jury's presence. During the conference, defense counsel

30

provided instruction 3.11, which he believed was the standard instruction on prior inconsistent statements as set forth in Illinois Pattern Jury Instructions, Criminal No. 3.11 (4th ed. 2000) (hereinafter IPI Criminal 4th). However, defense counsel's instruction inadvertently omitted a sentence. The State noted the error and provided defense counsel with a substitute copy of IPI Criminal 4th No. 3.11, which included the omitted sentence. Defense counsel accepted the substitute, and the revised instruction was given to the jury. However, the instruction contained a typographical error, which was not discovered before the instruction was given to the jury.

¶ 71 After closing arguments and jury deliberations, the jury found the defendant guilty of predatory criminal sexual assault of a child, aggravated battery of a child involving permanent disfigurement, and aggravated battery of a child involving great bodily harm. Thereafter, on December 1, 2023, the trial court merged the two aggravated battery convictions and sentenced the defendant to 40 years in prison for the predatory criminal sexual assault conviction and 20 years in prison for the aggravated battery conviction, to be served consecutively. The defendant appeals.

¶ 72                                    II. ANALYSIS

¶ 73 The defendant contends that his counsel's performance was deficient for two reasons: (1) counsel was ineffective when he played for the jury the videos of the police interviews of Whitney and Chelsey; and (2) counsel was ineffective when he submitted IPI Criminal 4th No. 3.11, which contained a typographical error. The defendant argues that these errors, taken together, constituted ineffective assistance of counsel.

¶ 74 To establish that counsel was ineffective, defendant must show that (1) counsel's performance was objectively unreasonable and (2) defendant suffered prejudice as a result. *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005). To satisfy the first prong, defendant must show that

his counsel's performance was deficient because it fell below an objective standard of reasonableness. *Id.* To meet the second prong, defendant must demonstrate prejudice by showing a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Perry*, 224 Ill. 2d 312, 342 (2007). In analyzing an ineffective assistance of counsel claim, a court may proceed directly to the prejudice prong without discussing whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The ultimate question of whether counsel's actions support a claim of ineffective assistance of counsel is a question of law that is subject to *de novo* review. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222.

¶ 75    First, the defendant argues that, in the interview videos, both Chelsey and Whitney made prejudicial statements that they did not testify to at trial. The defendant argues that the deficient performance prong of *Strickland* is easily demonstrated, as both the trial court and the State cautioned trial counsel, at trial, that playing the videos would involve presenting the jury with prejudicial inadmissible material. Also, trial counsel acknowledged the highly prejudicial material in Whitney's interview but declared that he was prepared to proceed at his own "peril" because he did not have the technological capabilities to edit the videos.

¶ 76    The defendant contends that the prejudicial impact of the interviews was immense, given that the videos contained recollections or comments adverse to the defendant that were not made during trial. Specifically, the defendant identified the following prejudicial statements from the interviews: (1) Chelsey sought to speak to the police because the defendant had admitted to her

and others that he had bitten, burned, and raped Tesla; (2) as soon as Chelsey observed Tesla's mouth injury, she went to the bedroom and contacted Whitney because she was afraid of the defendant; (3) while she was upstairs, the defendant remained downstairs playing PlayStation, and he showed no emotion and was seemingly unbothered; (4) there was so much blood on Tesla's diaper that it looked like it could have come from a woman who had just given birth; (5) the defendant was not good with babies and ordinarily did not take care of Tesla, and it was "weird" that he brought Tesla downstairs; (6) Chelsey asked the defendant whether he would turn himself in, and the defendant said he would; (7) Chelsey asked the defendant why he had bitten, hit, and burned Tesla, and he responded that it was because he was "frustrated because she was crying"; (8) Chelsey and Whitney confronted the defendant about the suspected sexual assault, asking whether he had used his penis or fingers, and he did not answer; (9) Whitney asked the defendant "how many times did this happen," and the defendant responded that it had only happened once; (10) Whitney claimed that the defendant was "weird" and psychotic, that he gave her the "creeps," and that she was told by her mother not to leave Tesla with the defendant; (11) Whitney spoke with the defendant, and he claimed that he had stayed awake all night, and someone came into the house while he was sitting in the living room and had hurt Tesla; (12) Chelsey showed the defendant the bloody diaper, and the defendant said that he did not notice or did not remember the blood in the diaper; (13) Whitney confronted the defendant about biting Tesla, and asked him what made him hurt the poor baby, and the defendant responded that he was frustrated; and (14) the defendant admitted to Whitney that he "only did it once" or he "only touched her once" when Whitney told him that Tesla had been raped.

¶ 77    The defendant notes that some of these comments were merely disparaging or descriptive of his suspicious behavior after Tesla's injuries were discovered while others involved his

33

damaging admissions or statements. More importantly, the defendant notes that both Chelsey and Whitney, in their interviews, claimed that the defendant had admitted to sexually assaulting Tesla, but they did not testify to this during the trial. The defendant argues that the jury was likely to accord these recollections considerable weight because they were made in investigatory interviews that took place within days of the incident while the trial was 5 1/2 years later.

¶ 78    As for the jury instruction issue, the defendant contends that the substituted jury instruction provided by the State contained a serious typographical error. Specifically, the substituted jury instruction stated as follows:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom. *However, you may consider a witness's earlier consistent statement as evidence without this limitation* when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of; and the statement was accurately recorded." (Emphasis added.)

In contrast, the emphasized portion of the instruction should have instead read, "However, you may consider a witness's earlier inconsistent statement as evidence without this limitation." In other words, the submitted jury instruction used the word "consistent" rather than "inconsistent" in that sentence.

¶ 79    The defendant acknowledges that the incorrect statement in the jury instruction was due to an unintended error, but he argues that the consequence of this error was that the law regarding prior consistent statements was completely misrepresented to the jury. The defendant argues that

34

the jury was incorrectly instructed to give elevated consideration to the accurately recorded prior consistent statements in the interviews of Chelsey and Whitney. Specifically, the defendant identifies two prejudicial consistent statements from the interviews: (1) Chelsey noted that when the defendant brought Tesla downstairs, Tesla's condition was not immediately apparent because Tesla's bruises had not yet come to the surface and (2) when Whitney saw Tesla on the day of the incident, Tesla had a thumb print on her neck. The defendant argues that, given that the videos were played for the jury without redactions, trial counsel was ineffective for submitting a jury instruction that permitted the jury to give these prior consistent statements an elevated level of consideration.

¶ 80    The defendant also contends that without trial counsel's errors, the result at trial would have probably been different, as there were no eyewitnesses to Tesla's abuse; there was a plausible alternative suspect, Durham; the defendant's admissions were made under coercive circumstances; and the defendant's admissions to Sergeant Hustedde may have been tainted by the suggestibility of a 19-year old subjected to a manipulative interrogation technique and the after-effects of blows to his head.

¶ 81    As we find that we are able to dispose of the defendant's ineffective assistance of counsel claims on the issue of prejudice, we need not determine whether counsel's performance was deficient. The evidence at trial indicated that Tesla's injuries were consistent with physical abuse and sexual assault and were not self-inflicted. Chelsey testified that she had put Tesla to bed the night before Tesla's injuries were discovered, and that Tesla did not have any injuries on her body at that time. Chelsey only noticed the injuries after the defendant brought Tesla downstairs in different clothing than Tesla had worn to bed. During his police interview with Sergeant Hustedde, the defendant admitted that he was upstairs alone with Tesla at the time and that he had bitten her.

35

The defendant's confession and Chelsey's testimony place him as the only person with Tesla at the time that Tesla was injured. Also, neither Brandon nor Whitney observed any injuries to Tesla when they saw her a day or two before the incident.

¶ 82    Further, the defendant's admission was corroborated by Dr. Wold's testimony that the bite marks on Tesla's right arm and left thigh near her genital area were human bite marks that were likely made by the same person. The defendant contends that Durham was a plausible alternative suspect, but none of the evidence indicated that Durham had been upstairs with Tesla when the injuries occurred or had ever been alone with Tesla. Although Sergeant Hustedde admitted that he never interviewed Durham as a suspect, Sergeant Hustedde explained that the defendant's account excluded Durham as a suspect.

¶ 83    In addition, when inspecting Tesla for injuries, Chelsey noticed that Tesla's diaper had been recently changed, which would have occurred when the defendant was upstairs alone with Tesla. Chelsey also discovered, thrown in the trash can in the bedroom where Tesla slept, a "blood filled diaper," several bloody wipes, and the clothing that Tesla had worn to bed. Chelsey put these items in plastic bags and then the plastic bags in a duffle bag. However, when she left the house, she accidentally left the bag there, and it was missing when she returned. Based on the testimony, the defendant was the only person remaining in the home when the duffle bag was left there. Chelsey's testimony was corroborated by Sergeant Hustedde finding a plastic bag containing these items in the nearby library dumpster and by the defendant's police interview video where the defendant knew the contents of the bag.

¶ 84    Further, the defendant had made certain admissions after the various witnesses had confronted him about Tesla's injuries. Specifically, Brandon testified that the defendant had admitted to biting Tesla in the leg because she would not stop crying. Whitney testified that the

36

defendant admitted to her that he had bitten and shaken Tesla, although he denied doing anything sexually to her. Durham asked the defendant whether the defendant had "done it," and the defendant responded that he had. When the defendant made this admission, Durham believed that the defendant was admitting to biting, burning, and raping Tesla. Conkle testified that while he was being held at the jail with the defendant, the defendant admitted to biting and burning Tesla. The defendant also admitted to using a Q-Tip in Tesla's vagina.

¶ 85    Although the defendant contends that his admissions were made under coercive circumstances, the evidence revealed that the defendant voluntarily went to Whitney's house, and there was no indication that he was not free to leave at any time. Moreover, there was no such coercive environment when the defendant made his admissions to Sergeant Hustedde. At the time of the interview, the defendant had an injury on his left temple that was the size of a dime or penny, but he did not exhibit any signs of having a head injury or of being in shock, he was oriented as to the date, he answered all of Sergeant Hustedde's questions, and he did not appear to be under duress. In addition, Sergeant Hustedde observed that the defendant had walked normally, never said he had a headache, and never indicated that he needed pain medicine or was in pain.

¶ 86    Regarding the DNA evidence, the defendant could not be excluded as a contributor to the oral swab taken from the sexual assault kit, and it was three times more likely that the defendant, or a male relative of his, was a contributor, compared to a random male. The defendant also could not be excluded as a major contributor to the DNA samples taken from the bite marks on Tesla's forearm and inner thigh. However, Durham was excluded as a possible contributor to the major profile on these swabs, as well as the swab taken from the tab of one of the diapers.

¶ 87    Taking all this evidence into account, we find that the evidence was overwhelming such that any prejudice resulting from defense counsel's alleged inadequate performance was not of a

magnitude that the outcome of the trial would reasonably have been different without the errors. Additionally, given the overwhelming evidence against the defendant, the typographical error in a minor jury instruction was unlikely to have any impact on the jury's decisions. Therefore, the defendant's claim of ineffective assistance of counsel fails.

¶ 88                                III. CONCLUSION

¶ 89    For the reasons expressed above, we affirm the defendant's convictions.


¶ 90    Affirmed.